# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FREDERICK WINZER,<br><br>            Plaintiff,<br><br>    v.<br><br>WACKENHUT CORRECTIONS<br>CORPORATION, et al.,<br><br>            Defendants.<br>_____/ | CASE NO. 1:03-cv-05678-SMS PC<br><br>ORDER DENYING DEFENDANTS' MOTION<br>FOR SUMMARY JUDGMENT<br><br>(Doc. 68) |

I.   Procedural History

Plaintiff Frederick Winzer ("plaintiff") is a federal prisoner proceeding pro se. Plaintiff seeks relief pursuant to Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), which provides a remedy for violation of civil rights by federal actors. This action is proceeding on plaintiff's amended complaint, filed July 28, 2005, against defendants Andrews, Barnes, Akanno, Sterling, and Steward ("defendants") on plaintiff's Eighth Amendment medical care claims. On April 26, 2007, defendants filed a motion for summary judgment. Plaintiff filed an opposition on August 28, 2007, and defendants filed a reply on September 10, 2007.[1]

II.  Legal Standard on Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R.

---

[1] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the court in an order filed on July 1, 2003, and by defendants on April 26, 2007. Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (Docs. 5, 68.)

1

Civ. P. 56(c). Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual

dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

III.   Defendants' Motion for Summary Judgment

A.   Plaintiff's Claims

In his amended complaint, plaintiff alleges that defendants violated his rights under the Eighth Amendment when they acted with deliberate indifference to his medical needs after he injured his right finger and left eye in two separate incidents.  Plaintiff alleges that on July 12, 2000, he injured his right finger while playing basketball.  Plaintiff was seen by Dr. Girgis at the medical facility and he informed Dr. Girgis that his pain was a ten on a scale of one to ten.  Dr. Girgis ordered x-rays to be performed on July 14, 2000, and put a splint on plaintiff's finger.  Plaintiff alleges that prior to the 14th, he returned to the medical facility because of extreme pain, discomfort, and swelling, and was seen by defendant Akanno.  Plaintiff alleges that defendant Akanno determined

1  that plaintiff was in extreme pain and removed the splint. On July 20, 2000, defendant Akanno
2  reviewed the x-rays that had been taken, determined plaintiff had broken his finger, and scheduled
3  plaintiff to be seen by an orthopedic surgeon.
4        Plaintiff alleges that on August 5, 2000, he was seen by Dr. Chandra, an outside specialist,
5  who determined that plaintiff would have to be seen by a hand specialist. Plaintiff alleges that
6  defendant Akanno was informed by Dr. Chandra that plaintiff needed to be seen by Dr. Malerich,
7  the orthopedic specialist, as soon as possible. Plaintiff alleges that he was not seen by Dr. Malerich
8  until November 29, 2001. Plaintiff alleges that Dr. Malerich refused to treat plaintiff's injury
9  because it had grown into a grotesque configuration, and plaintiff was a poor candidate for surgery.
10 Plaintiff alleges that he has suffered a permanent injury to his right hand and has been left a poor
11 candidate for reconstructive surgery, and will suffer pain and discomfort throughout his life.
12       Plaintiff's second claim arises from an injury to his left eye he sustained on August 19, 2000,
13 while playing basketball. Plaintiff alleges that he was transported to Fritch Eye Care Center, where
14 Dr. Fritch determined that there was too much trauma for a proper evaluation and ordered that
15 plaintiff be returned in two weeks. Plaintiff alleges that he next saw Dr. Fritch on September 20,
16 2000, at which time plaintiff was seeing double. Plaintiff alleges that he was provided with
17 medication and an eye patch, and follow-up care was recommended. Plaintiff alleges that staff failed
18 to follow up on the recommendation, which caused plaintiff to be a no-show for an October 31, 2000
19 appointment. Plaintiff alleges he was subsequently seen by Dr. Grisso at Fritch Eye Care Center,
20 who examined plaintiff for a pair of eyeglasses. Plaintiff alleges that he was again seen at Fritch Eye
21 Care Center on January 15, 2001, at which time a hemorrhage was discovered. Plaintiff alleges that
22 he now suffers from double vision and must wear an eye patch, and has no peripheral vision on his
23 left side.
24       B.    <u>Legal Standard for Eighth Amendment Medical Care Claims</u>
25       "[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate
26 must show 'deliberate indifference to serious medical needs.'" <u>Jett v. Penner</u>, 439 F.3d 1091, 1096
27 (9th Cir. 2006) (quoting <u>Estelle v. Gamble</u>, 429 U.S. 97, 106, 97 S.Ct. 295 (1976)). The two part
28 test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by

4

demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." Jett, 439 F.3d at 1096 (quoting McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal quotations omitted)). "The requirement of deliberate indifference is less stringent in cases in involving a prisoner's medical needs than in other cases involving harm to incarcerated individuals because '[t]he [government's] responsibility to provide inmates with medical care ordinarily does not conflict with competing administrative concerns.'" McGuckin, 974 F.2d at 1060 (quoting Hudson v. McMillian, 503 U.S. 1, 6, 112 S.Ct. 995 (1992)). Deliberate indifference is shown by "a purposeful act or failure to respond to a prisoner's pain or possible medical need, and harm caused by the indifference." Id. (citing McGuckin, 974 F.2d at 1060). Deliberate indifference may be manifested "when prison officials deny, delay or intentionally interfere with medical treatment, or it may be shown by the way in which prison physicians provide medical care." Id. (citing McGuckin at 1060 (internal quotations omitted)). Where a prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm in order for the prisoner to make a claim of deliberate indifference to serious medical needs. McGuckin at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404, 407 (9th Cir. 1985)).

    C.    Undisputed Facts[2]

1. Plaintiff is a federal inmate who was housed the Taft Correctional Institution ("TCI") from October 22, 1998, to April 12, 2002.
2. On July 12, 2000, plaintiff injured his right ring finger while engaging in sports.[3] The finger was bruised and swollen, and Dr. Girgis ordered an x-ray.
3. On July 14, 2000, plaintiff returned to the clinic and was examined by defendant Akanno, a physician. Plaintiff was not in distress, but his finger was tender and swollen, and he

---

[2] Defendants submitted additional facts concerning other medical conditions plaintiff suffered from and other injuries plaintiff sustained, among other issues. Facts irrelevant to plaintiff's claims in this action have been omitted.

[3] Defendants state that the injury occurred while plaintiff was playing softball while plaintiff alleges it occurred while he was playing basketball.

5

      complained of crepitus (crackling joints). Defendant Akanno prescribed a splint for the fractured finger, ordered another x-ray of plaintiff's hand, and prescribed Tylenol #3 for pain.[4]

4. On July 19, 2000, another x-ray of plaintiff's hand was taken and Dr. Girgis ordered that use of the splint be discontinued. Another prescription for Tylenol #3 was issued.

5. On July 20, 2000, defendant Akanno reviewed the x-ray results after splinting the fracture and noted some angulation and realignment of the finger. Defendant Akanno ordered a follow-up appointment with a doctor as soon as possible. Plaintiff was re-evaluated that same day. Plaintiff's finger was still tender and swollen, and defendant Akanno ordered a stronger pain reliever and that plaintiff be seen by an orthopedic specialist.

6. On August 2, 2000, plaintiff was scheduled for an appointment with Dr. P. R. Chandrasekaran ("Dr. Chandra") with the Pacific Orthopedic Medical Group, an outside specialist. In the referral form, defendant Akanno noted that the injury presented a moderate disability and that plaintiff could not hold things effectively with his right hand, but that he believed the prognosis was good.

7. Dr. Chandra evaluated plaintiff's finger on August 2, 2000, and suggested a referral to Dr. Matthew Malerich at the Kern Medical Center Hand Clinic ("KMC") as soon as possible due to the complexity of the injury.[5] Dr. Chandra submitted a written evaluation to TCI outlining his findings, and communicated his recommendations to defendant Akanno. In his report, Dr. Chandra noted that the fracture was already four to five weeks old, it would be difficult to reduce it, a reconstructive procedure by a hand specialist may be needed, and that plaintiff needed to be sent to KMC for further reconstructive procedure.

///

---

[4] Although defendants do not describe the injury as a fracture, the medical records relied on by defendants to support this fact demonstrate that when plaintiff was seen by defendant Akanno on July 14, 2000, the x-ray ordered by Dr. Girgis had revealed the finger was fractured, and defendant Akanno ordered a splint for the fracture. (Doc. 77, Court Record pg. 11.)

[5] Dr. Chandra also evaluated a previous injury to plaintiff's left finger. The facts pertaining to the left finger injury are omitted because they are not relevant to plaintiff's claim in this action.

8. On August 19, 2000, plaintiff was playing basketball when someone poked plaintiff in his left eye with a finger.

9. Dr. Patel examined plaintiff and noted that plaintiff's left eye lid was swollen and there was a laceration near the eye. Plaintiff complained of blindness in his left eye and Dr. Patel ordered that he be taken immediately to the emergency room at San Joaquin Community Hospital for an examination by an ophthalmologist. Plaintiff was released to security and transported to the hospital one and a half hours later.

10. Plaintiff spent four days in the hospital and was examined by Dr. Charles D. Fritch of the Fritch Eye Care Clinic on August 22, 2000. Dr. Fritch concluded that plaintiff had (1) ptosis (drooping) of the left upper eye lid; (2) Hyphema (blood in the eye); (3) a laceration of the left upper eye lid; and (4) a subconjunctival hemorrhage (bursting of a blood vessel in the eye). Dr. Fritch recommended a fundus picture of plaintiff's eye to further diagnose plaintiff's injury and that plaintiff return in two weeks for a follow-up.

11. Plaintiff was admitted to the infirmary after returning to TCI, removed from the regular housing unit, given two weeks of "lay-in" (restricted duty), given extra pillows, scheduled for daily follow-up appointments if needed, scheduled for a follow-up with Dr. Fritch in two weeks, prescribed Tylenol #3, and instructed with regard to maintaining his eye patch.

12. Plaintiff was seen on October 4, 2000, by defendant Akanno. Plaintiff reported that he was awaiting appointments with Dr. Malerich's and Dr. Fritch's offices, and that a nurse gave him ear drops in his injured eye the night before rather than eye drops. Defendant Akanno noted the difficulty plaintiff was having with his injured eye, and that plaintiff was to follow-up with Drs. Malerich and Fritch.

13. Plaintiff was seen by a nurse on October 9, 2000, for his complaint that his eye was dry and not getting enough nutrients, and on October 25, 2000, plaintiff requested an eye wash.

14. Plaintiff's October 11, 2000 appointment with Dr. Fritch was rescheduled to October 31, 2000, and plaintiff returned from his appointment with a prescription for lubricating eye drops to be administered for thirty days.

///

15. On January 10, 2001, plaintiff requested a copy of his medical records concerning his medical care at Fritch Eye Care.

16. On January 19, 2001, plaintiff was seen by defendant Akanno. Plaintiff complained about his vision problems and requested removal of his left eyeball in addition to asking to be moved to a different sleeping spot in the dormitory and asking for special shoes as treatment for flat feet. Defendant Akanno medically unassigned plaintiff; ordered that plaintiff be assigned to another bed and a different sleeping spot where the lights would not disturb him, plaintiff be provided with insoles for his shoes, and Mrs. Jordan be asked to call Dr. Malerich's office and obtain an appointment as soon as possible; and advised plaintiff to think again about his request that his left eyeball be taken.

17. Mrs. Jordan called Dr. Malerich's office several times to schedule an appointment but was not successful.

18. One of the vexing problems that TCI faces when an inmate is chronically injured is getting outside providers to accept appointments for inmate patients on a timely basis.

19. On February 16, 2001, plaintiff came to the infirmary asking to see a doctor and an eye doctor. Plaintiff had seen defendant Akanno on January 19, 2001, and Dr. Fritch on January 15, 2001. An appointment to see defendant Akanno on February 26, 2001, was made, and an appointment to see Dr. Fritch was made.

20. Plaintiff was seen by defendant Akanno on February 23, 2001, for his complaint of weight loss. In addition to addressing plaintiff's weight loss complaint, defendant Akanno ordered that plaintiff be scheduled to see an optometrist.

21. On March 7, 2001, plaintiff was examined by Dr. Simonson, TCI's optometrist. Dr. Simonson authorized plaintiff to wear sunglasses indoors due to severe photophobia.

22. On July 18, 2001, plaintiff went to the infirmary and complained of pain in his left eye. Plaintiff was given Tylenol. This was plaintiff's only registered complaint concerning his injured eye since February 23, 2001.

23. On August 7, 2001, defendant Akanno again requested that plaintiff be scheduled for an appointment with Dr. Malerich.

24. On November 29, 2001, prior to being seen by Dr. Malerich for his fractured finger, plaintiff was seen by Nurse Glazier at TCI. Nurse Glazier noted that plaintiff was able to move his injured finger. Although plaintiff was not able to close it all the way, he could close it enough to be useful. Nurse Glazier noted that plaintiff held his thumb out to help prevent flexion.

25. Following plaintiff's appointment with Dr. Malerich, defendant Akanno noted that Dr. Malerich wanted to see plaintiff again in six months and ordered that plaintiff be scheduled to see Dr. Malerich in six months. Dr. Malerich noted in his report that plaintiff had no pain and no crepitus.

26. On February 8, 2002, plaintiff had an appointment with Dr. Simonson, the optometrist. Dr. Simonson noted that he would make prescription eyeglasses for plaintiff with the left lens blacked out, but that plaintiff was informed the prescription eyeglasses would not correct the diplopia (double vision). Dr. Simonson noted that plaintiff was referred to Dr. Fritch for evaluation but Dr. Fritch was unable to help him. Plaintiff visited Dr. Fritch's office a total of four times for treatment of his eye injury: August 22, 2000, September 20, 2000, October 31, 2000, and January 15, 2001. Dr. Fritch ultimately diagnosed plaintiff as suffering from optic atrophy due to traumatic vitreous hemorrhage.

27. Plaintiff was transferred from TCI on April 12, 2002.

28. Plaintiff submitted a Step 1 Administrative Remedy on October 26, 2000, alleging that he was being denied a second opinion and medical treatment for his eye injury. Defendant Barnes responded to this request on November 13, 2000, and explained that plaintiff's treatment was ongoing, outlining the steps taken by TCI up to that point in time. Defendant Barnes noted that surgery was not recommended for plaintiff's injured eye. Plaintiff did not institute a Step 2 Administrative Remedy in response.

29. On August 2, 2001, plaintiff filed another Step 1 Administrative Remedy alleging that his medical needs were not being met at TCI. Defendant Steward responded on August 13, 2001, stated that TCI was doing everything it could to facilitate medical treatment for

1  plaintiff's injuries, and noted that medical staff were having difficulty getting a hand
2  specialist to accept plaintiff's case.
3  30.   On October 23, 2001, plaintiff's medical records pertaining to his eye and hand injury were
4  sent to the Western Region Office of the BOP for BP-10 the administrative review process
5  initiated by plaintiff.

D.   Serious Medical Need - Fractured Finger

Defendants first argue that the injury to plaintiff's right finger was not serious given that it did not preclude him from engaging in the basketball game during which his eye was injured a mere sixteen days after sustaining the injury to his finger. Defendants argue that an injury serious enough to deprive one of the "minimal civilized measure of life's necessities" would certainly preclude one from being able to play basketball. (Motion, 20:21-23.)

"[T]he existence of an injury that a reasonable doctor would find important and worthy of comment or treatment, . . . the presence of a medical condition that significantly affects an individual's daily activities, and . . . the existence of chronic or substantial pain" are indications of a serious medical need. Doty v. County of Lassen, 37 F.3d 540, 546 n.3 (9th Cir. 1994) (citing McGuckin, 974 F.2d at 1059-1060); Lopez, 203 F.3d at 1131. The injury at issue was a fractured finger. While the court would be inclined to agree that choosing to engage in a basketball game with a fractured finger was likely an unwise choice, plaintiff's failure to make wise choices does not render his injury unserious.

As a result of his injury, plaintiff was examined by doctors at TCI and sent to Dr. Chandra, an outside specialist with an orthopedics group, for evaluation. (Undisputed Facts 2-7.) Due to the complexity of the injury, Dr. Chandra recommended that plaintiff be seen by Dr. Malerich at a hand clinic as soon as possible for further reconstructive procedure. (U.F. 7.) Defendants have presented no medical evidence that a fracture would not be considered a serious medical need and the evidence in the record belies such a claim. The court declines to find that just because plaintiff opted to play basketball after being injured, a fracture is not an injury a doctor would find important and worth of comment or treatment, is not an injury that affects daily activities, or is not an injury that causes

///

chronic or substantial pain.  See Jett, 439 F.3d at 1096 n.1 (undisputed that fractured thumb a serious medical need).

E.   Deliberate Indifference - Delay in Medical Treatment

Defendants next argue that there is no evidence of deliberate indifference.  Defendants recount the medical treatment provided to plaintiff, and argue that plaintiff was treated promptly, that plaintiff has provided no evidence to contradict the sound medical judgment of Dr. Akanno, Dr. Chandra, and Dr. Malerich, and that plaintiff's eye injury would not have benefitted from different treatment.  Defendants have identified, in part, what is a deficiency in their own motion: little to no relevant medical evidence.  Defendants have not provided any meaningful explanation regarding the extent of plaintiff's injuries and what treatment is medically acceptable for such injuries.  Defendants bear the burden as the moving parties and unless and until they meet their burden, plaintiff is not obligated to produce any evidence.  Without belaboring the point, it is noteworthy that this is defendants' second motion for summary judgment and they did not meet their burden in the first motion either.  (Docs. 34, 35.)  The court was frank regarding the numerous deficiencies in that motion.  (Doc. 34.)  Despite a second bite at the apple, little has improved.

A *complete* denial of medical care is not required to show deliberate indifference.  Lopez v. Smith, 203 F.3d 1122, 1132 (9th Cir. 2000).  "The Eighth Amendment requires that prison officials provide a system of ready access to adequate medical care."  Hoptowit v. Ray, 682 F.2d 1237, 1253 (9th Cir. 1982).  "[M]edical staff must be competent to examine prisoners and diagnose illnesses," and must either "be able to treat medical problems or to refer prisoners to others who can."  Id.

Plaintiff fractured his finger on July 12, 2000, and was seen by an outside specialist on August 2, 2000.  (U.F. 2, 7.)  The specialist recommended that plaintiff be seen by Dr. Malerich, a hand specialist, as soon as possible for a reconstructive procedure.  (U.F. 7.)  Plaintiff was eventually seen by Dr. Malerich on November 29, 2001, almost sixteen months after Dr. Chandra recommended that he be seen as soon as possible by Dr. Malerich due to the complexity of his injury.  (U.F. 24.)

After fracturing his finger, plaintiff injured his eye on August 19, 2000, and spent four days in the hospital as a result of the injury.  (U.F. 8, 10.)  Following his appointment with Dr. Fritch on August 22, 2000, while still in the hospital, plaintiff was to be seen again in two weeks.  (U.F. 10.)

Plaintiff was seen again by Fritch Eye Care Center more than four weeks later, on September 20, 2000. (U.F. 26.) Thereafter, plaintiff was seen two more times by Fritch Eye Care Center, on October 31, 2000, and January 15, 2001. (Id.) It is not clear what happened during those appointments, but Dr. Fritch ultimately diagnosed plaintiff as suffering from optic atrophy due to traumatic vitreous hemorrhage. (Id.)

Plaintiff alleges that he sustained permanent damage to his finger and eye as a result in the delay in treatment, and the evidence in the record supports the allegation that there was permanent damage to plaintiff's finger and eye, although the exact extent of the damage is not clear, particularly with respect to the finger. The court cannot determine whether plaintiff would have sustained that damage regardless or whether the damage could have been prevented had he been seen sooner by specialists. While plaintiff appears to have had immediate access to medical staff at TCI following his injuries, and access to TCI medical staff throughout his incarceration at TCI, there is no evidence from which the court may make a finding that the medical care plaintiff was provided with by prison officials was adequate given the nature and extent of his injuries. Both of plaintiff's injuries required the examination and treatment by outside specialists. Defendants have not provided any evidence explaining the diagnoses by the outside specialists or demonstrating plaintiff was provided a medically appropriate course of treatment for his injuries.[6]

Difficulty in arranging for appointments with specialists is not a shield against liability under the Eighth Amendment. (U.F. 18.) It is not even clear what the nature of the difficulty in contacting Dr. Malerich's office was. Defendants submit evidence that several unsuccessful attempts were made to schedule an appointment regarding plaintiff's fracture. (U.F. 17.) There is no information provided to shed light on what occurred and what the difficulty was. Did medical staff leave a couple of voicemail messages that were not returned? Did Dr. Malerich's office refuse to see plaintiff? Regardless, prison officials have a duty to ensure that prisoners receive medical care by outside specialists if prison medical staff cannot treat the injury. Hoptowit, 682 F.2d at 1253. An

---

[6] Although Dr. Fritch ultimately diagnosed plaintiff with optic atrophy due to traumatic vitreous hemorrhage, defendants have not submitted any evidence by a medical expert explaining what that diagnosis means, what the appropriate treatment for such a condition was, and, most importantly in this case, whether a delay in treatment worsened the injury or had any affect at all on that ultimate diagnosis.

administrative burden in scheduling outside appointments does not relieve prison officials of this duty.

Defendants argue that Dr. Malerich did not want to see plaintiff for six more months after examining him on November 29, 2001, and that Dr. Malerich noted plaintiff felt no pain and had no crepitus. (Doc. 69, C.R. pg. 22, lns. 21, 23-24.) Defendants conclude that plaintiff's injuries were not serious and did not require immediate attention, and that there is no indication from plaintiff's providers that his finger had grown into a grotesque configuration as alleged by plaintiff. (Id., pg. 22, lns. 24-25 & pg. 23 lns. 1-2.)

Unlike the consult with Dr. Chandra, there is no comprehensive report in the record from Dr. Malerich evaluating plaintiff's injury and suggested course of treatment.[7] (Doc. 77, C.R. pgs. 44, 45, 53.) The court has no way of determining what Dr. Malerich's diagnosis of plaintiff's finger problem was at that time or whether it was too late to treat the finger. Plaintiff did not see Dr. Malerich until almost sixteen months after his injury. Evidence that at that time plaintiff felt no pain and had no crackling of the joints simply does not address plaintiff's claim that as a result of this delay, he was not a candidate for reconstructive surgery and sustained permanent damage. Evidence that Dr. Malerich did not want to see plaintiff for another six months likewise does not address plaintiff's claim. By that time, the injury was far from fresh and Dr. Malerich's request that plaintiff follow up in six months does not assist defendants in demonstrating that the finger injury was not serious at the time it occurred and did not require immediate, more specialized attention than it received.

Defendants also argue that plaintiff was regularly seen by medical staff between August 25, 2000, and his next appointment with Dr. Fritch on September 20, 2000, and that his eye was constantly monitored during that time. (Doc. 69, C.R. pg. 24, lns. 7-10.) Defendants argue that plaintiff's eye was not surgically repairable and would not have benefitted from different treatment. (Id., lns. 14-15.)

///

---

[7] The medical record provided by defendants is largely illegible due to Dr. Malerich's handwriting and does not appear to be particularly detailed in any event.

13

1    Although defendant Sterling attests that plaintiff was seen regularly and his eye constantly
2 monitored between August 25, 2000 and September 20, 2000, there is simply no evidence supporting
3 this statement. Plaintiff's medical records reveal that prescriptions were written or refilled on four
4 occasions, lab work was done on one occasion, and plaintiff signed a consent form to release medical
5 information. (Doc. 76, C.R. pgs. 29-30 & 27.) This falls well short of supporting Ms. Sterling's
6 assertion of constant monitoring and regular appointments for the eye injury.

7    In support of their argument that plaintiff's eye was not surgically repairable and would not
8 have benefitted from different treatment, defendants rely upon defendant Barnes' response to
9 plaintiff's grievance. (Doc. 69, C.R. pg. 24, lns. 14-15.) Defendant Barnes was the Assistant
10 Warden of Programs at the time and stated in his response dated November 13, 2000, that surgery
11 had not been recommended by any physicians to date. (Doc. 77, C.R. pg. 58.) Defendant Barnes
12 is not qualified to render an expert opinion that plaintiff's eye was not surgically repairable and
13 defendants have submitted no evidence at all supporting their assertion that plaintiff's injury would
14 not have benefitted from different treatment.

15    In moving for summary judgment, defendants rely on plaintiff's medical records, and the
16 declarations of Dale Patrick, the Executive Assistant of TCI, and defendant Sterling, a registered
17 nurse. Notably absent is the declaration of any medical doctor interpreting plaintiff's injuries, the
18 course of treatment, and the damage sustained by plaintiff. In the absence of any evidence by an
19 expert interpreting plaintiff's medical records, course of treatment, and injuries, the court has no
20 basis upon which to find that the medical treatment provided to plaintiff by TCI was medically
21 acceptable and the delays in seeing specialists did not cause further harm. Defendants have not met
22 their burden as the parties moving for summary judgment and their motion must be denied.

23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

IV.     Conclusion

For the foregoing reasons, the court finds that defendants have not met their burden as the parties moving for summary judgment. Accordingly, defendants' motion for summary judgment, filed April 26, 2007, is HEREBY DENIED.

This matter is ready to be set for jury trial. The court will issue a scheduling order in due course, but will first attempt to find counsel to represent plaintiff for the remainder of the proceedings in this action.

IT IS SO ORDERED.

**Dated:    October 4, 2007**                          /s/ Sandra M. Snyder
                                              UNITED STATES MAGISTRATE JUDGE